IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KARRI A. EVANS,                    )

                                      )

      Plaintiff,             )

                                        )

v.                               )      CIVIL ACTION NO.

                                      )      04-0364-BH-C

MOBILE INFIRMARY MEDICAL CENTER,   )

WILLIAM S. ROBERTS, CHRIS       )

LAWRENCE, and BARRY JONES,      )

                                      )

      Defendants.           )

**FINDINGS OF FACT; CONCLUSIONS OF LAW;
AND ORDER**

This action is before the Court on defendants' respective motions (Docs. 38 and 40)

for summary judgment. Upon consideration of the motions, plaintiff's brief in opposition

thereto (Doc. 48), defendants' replies (Docs. 53 and 54), and all other pertinent portions of

the record, the Court concludes that the motions are due to be granted.

**FINDINGS OF FACT**

The Court has considered all the evidence of record, both testimonial and

documentary, and finds that the following facts are undisputed or uncontradicted by the

plaintiff.

**I.  Scott Roberts**

1.      On June 7, 2004, the plaintiff, Karri A. Evans ("Evans") filed a multi-count

Complaint which included several counts against the individual defendant, Scott Roberts

("Roberts").[1]  On August 31, 2004, this Court entered an Order (Doc. 19) dismissing all but

one of the Counts against Roberts.  The sole remaining claim against this defendant is for

Assault under Alabama tort law as set forth in Count II of the Complaint.

2.      Evans is a respiratory therapist who was an employee of Mobile Infirmary

Medical Center ("MIMC") on two separate occasions.  Evans began her employment the

first time in July of 1996 and worked until February of 1999.  (Evans Dep. at 6, 12-13).

Evans returned to MIMC in October of 1999 and worked there until December of 2003.

(Evans dep. at 12).

3.      Evans knew defendant William S. "Scott" Roberts ever since she began her

employment in 1996, since they both worked as respiratory therapists at MIMC.  There

were no incidents of harassment between Roberts and Evans during the period of her first

employment from 1996 to 1999.  Evans testified that, during that period, Roberts did not

do or say anything to her that was off-color or offensive in any way.  (Evans Dep. at 15-16).

4.      In fact, Evans testified that Roberts did not do or say anything that was

offensive, rude or hostile to Evans during 1999, 2000, 2001, 2002 and 2003.  (Evans Dep.

at 16-18).  Evans also testified that Roberts did not do anything of a sexual nature towards

her in the years 1996 through 2001 and in 2003 up until the time she left her employment

at MIMC.  (Evans Dep. at 18-20).

---

[1]Evans has proffered no evidence to support the clearly scandalous allegations she set forth in
her Complaint at paragraph 19 concerning Roberts' alleged termination of employment from the
University of South Alabama, which Roberts has declared with no uncertainty to be false.

5.      According to Evans, in April, May and June of 2002, there were "approximately four incidents" which comprise her assault and harassment claim.  (Evans. Dep. at 18).  The first incident allegedly occurred in the equipment room around April of 2002.  Evans described the room as being approximately eight by ten feet in size.  It was a room used to clean respiratory equipment.  (Evans Dep. at 22).  Evans testified that on this occasion Roberts entered the room and asked her "how the girls were doing."  Evans admitted that Roberts did not touch her in any manner.  (Evans Dep. at 24).   Although Evans argues that "the comment was made in reference to her breasts," she admits that this supposition is based upon what another individual told her.  (Evans Opposition Brief at 2). According to Evans, she left the room as soon as Roberts made the statement, without saying anything back to him.  Evans admitted that she did not report this incident until months later.  (Evans Dep. at 24 and 27).

6.      The second alleged incident is described by Evans as being when Roberts "grabbed my bottom."  (Evans Dep. at 27).  It was a one-handed grab according to Evans. (Evans Dep. at 29).  Evans contends that this occurred at the secretary's desk in front of the department in May of 2002.  (Evans Dep. at 28).  According to Evans, Roberts walked up behind her and grabbed her bottom whereupon she jumped away.  (Evans dep. at 28). Evans does not contend that Roberts said anything to her when he allegedly grabbed her.  Evans admits that, with respect to this alleged incident: she did not say anything to Roberts (Evans Dep. at 29);  she did not slap him (*Id*. at 30);  she did not report him (*Id*.); and  she did not

tell her co-workers who were approximately twenty feet away about what had happened (*Id*. at 31).

7.      Evans alleges that the third incident was another "butt grab" that also occurred in May of 2002 in the same location as the second incident.  (Evans Dep. at 31).  Evans again admits that, at the time of the incident, she neither said anything to Roberts or to anyone else, nor did she slap him.  Evans also admits that Roberts did not say anything to her on this occasion.  (Evans Dep. at 32).

8.      Evans alleges that the fourth and final incident occurred on June 10, 2002. Evans testified that Roberts fondled her breast on that occasion in the tech room during the shift change between 10:30 and 11:00 p.m.  (Evans Dep. at 33-34.  Evans described the tech room as an open room for people coming in and out, where the respiratory therapists meet to give report to the therapists coming on duty at the shift change.  (Evans Dep. at 34-35. According to Evans, Roberts came into the room and started commenting on how wrinkled her lab coat was.  He then started to shake her lab coat, at which point she alleges that his hand went to her breast.  (Evans Dep. at 36).  Evans admitted that her lab coat was indeed wrinkled.  (Evans Dep. at 36).  Evans also admitted that Roberts did not touch her skin; she did not say anything to him; he did not say anything of a sexual nature to her; she had four layers of clothing on, including a bra, t-shirt, scrubs, and a lab coat; the alleged touching lasted "not even . . . a few seconds"; and Roberts did not indicate any anger towards her. (Evans. Dep. at 36-41).

4

9.      The first time Evans told anyone about any of these alleged incidences was on

June 15, 2002.  (Evans Dep. at 32 and 41).

10.      According to Evans, June 10, 2002, was the last time she was subjected to

any touching by Roberts.  (Evans Dep. at 41 and 53).  There was never any other incident

between Roberts and Evans.  (Evans Dep. at 41 and 53).

11.      Evans concedes that she has not seen a counselor, minister, psychiatrist,

therapist, or any kind of mental health provider as a result of the four incidents that she

described.  (Evans Dep. at 42-43).

12.      Evans has suffered no damage as a result of any alleged touching by Roberts.

(Evans Dep. at 42-43).

## II.  Mobile Infirmary Medical Center

1.      The aforementioned Findings of Fact # 1 through 12 are applicable to the

claims asserted against MIMC and are, therefore,  incorporated in this section.

2.      Scott Roberts started his employment with MIMC in 1996 as a respiratory

therapist working part time in the Department of Pulmonary Services.  (Roberts Dep. at 11-

12).  In June 2000, he became a full time employee of MIMC.  In late 2001, he applied for

and was promoted to a supervisory position known as a "team leader" on the 3-11 shift.

(Roberts Dep. at 21).  At this time, Roberts became one of Evans' supervisors when she

worked from 3:00 p.m. to 11:00 p.m.  (Evans Dep. at 145).

3.      MIMC requires all new employees to attend an orientation.  (Stembridge

Aff.).  Evans and Roberts attended such an orientation which includes a presentation by the

5

Department of Human Resources.  The presentation covers the "Anti Harassment Policy" which states the purpose of the policy; explains what conduct is not permitted; describes in detail the complaint/reporting procedures; and also includes suggested guidelines for reporting the harassment.  (Stembridge Aff).  The policy is available to the employees in the Personnel Policy Manual located in every department and is also posted on several employee bulletin boards throughout the hospital, including three on the same floor where Plaintiff's department is located and another on the walkway to the employee parking garage. (Stembridge Aff).  The "Anti Harassment Policy" states, in part:

> (1) any employee or agent who is subjected to harassment should report such conduct to the Human Resources Department.  Such employee should report only to a Human Resources Department Coordinator, Manager, Director or Vice President.  In the event Human Resources personnel are not available (e.g., night/weekend shifts) the employee should report the behavior to any supervising or management personnel with whom he or she feels comfortable.

(Stembridge Aff., Ex. A).

4.      The Department of Pulmonary Services performs respiratory therapy services for patients throughout the hospital.  Each therapist is assigned to a certain area and certain patients for each shift.  They give breathing treatments, do ventilator checks and assist in various other procedures.  They would receive their assignments and perform their charting in a common area they refer to as the "tech room".  (Evans Dep., at pp. 309-10).

5.      Evans claims against MIMC arise from the four alleged incidents of sexual harassment described above, which occurred in April and June of 2002.  According to

Evans, the last incident occurred on June 10, 2002, the occasion when Roberts made a

comment about Evans' wrinkled lab coat and then started to shake her lab coat whereupon

"his hand went onto my breast."  (Evans Dep. at 33 and 36).  Evans conceded that Roberts

made no sexual comments or innuendos during any of the three alleged touching incidents

reported by Evans.  (Evans Dep. at 36).

      6.      Evans testified that the first time she reported any offensive conduct was on

June 15, 2002 when she reported the conduct to Barry Jones, head of the Department of

Pulmonary Services.  (Evans Dep. 32 and 41).   According to Jones and Stembridge, Evans

first reported the matter on June 13, 2002, the same day a meeting was held between

Roberts, Jones, and Chris Lawrence, supervisor of the Department of Pulmonary Services

to address the issue.  (Jones Dep. at 18; Stembridge Aff. at Ex. B).

      7.      After several more conversations with the Human Resources Department and

Evans, a conference was held on June 18, 2002 with both Evans and Roberts.  (Stembridge

Aff. at Ex. B; Evans Dep. at 80).  Roberts apologized for perceived improprieties and

confirmed his understanding of appropriate and professional behavior in the workplace.

The counseling sessions were documented in Roberts' file.  (Stembridge Aff. at Ex. B).

Evans had no further complaints of sexually offensive comments or conduct by Roberts.

(Evans Dep. at 80).

      8.      On July 10, 2002, a second therapist, Melissa Hanes, reported to Stembridge

conduct by Roberts which occurred during the period from mid-April 2002 to June 5,

2002. Her complaint was investigated.  Both Roberts and a purported witness denied her allegations. (Stembridge Dep., at pp. 40-43, 60, 64; Stembridge Aff., Ex. C).

9.      Even though there were no allegations of harassment by Roberts following his counseling on June 18, and even though Roberts denied the allegations, Stembridge and Jones  removed Roberts from his supervisory position on July 26, 2002, because of the seriousness of the allegations and the perception that some inappropriate activity occurred. (Stembridge Dep. at 62; Jones Dep. at 30-31).  He was also moved to the day shift (7:00 a.m. to 3:00 p.m.) position where he could be supervised more closely.  (*Id.*).  Due to the shift change he lost a shift differential that would roughly equate to a couple thousand dollars a year. (Stembridge Dep. at 73).   Roberts was demoted in title and responsibility. Due to the demotion he was reduced in his pay grade which reduced the maximum salary he could receive (Stembridge Dep. at 110-111).

10.      After these actions were taken, there were no further incidents or complaints of sexually harassing or hostile conduct from Evans or anyone else.

11.      Evans did complain on August 2002 about having to "take report" from Roberts when she took over from his shift and he would update her on the status of particular patients she was taking over.  Roberts did nothing offensive in that episode. (Evans Dep. at 209, 292 and Ex. 28).  Roberts was counseled.  (Jones Dep. at Ex. 2).  After that complaint, she had no further problems with Roberts in any regards.  (Evans Dep. at 203).  Evans was even allowed to transfer assignments to other employees on two other

occasions over the following three months to avoid having to take report from Roberts,

with no repercussions.  (Evans Dep. at 221, 228).

12.    Evans also alleges that she was retaliated against for reporting the conduct of

Roberts.  Her allegations of retaliation include having to give to and take report from

Roberts, being scheduled to work with Roberts (Evans Dep. at 208-9), being required to

attend a meeting with Barry Jones in which he told her she was inconveniencing the

department and she should take advantage of the counseling available through the Employee

Assistance Program.  (K. Evans Dep.at 212-14), and receiving what she considered to be a

bad evaluation (K. Evans Dep.at 98-102).  She also claims that she was closely scrutinized

and treated poorly by Chris Lawrence and Barry Jones after she reported Roberts.

13.    Despite these allegations of alleged retaliation, Evans has proffered no

evidence that she suffered any specific adverse employment action.[2]  Evans received a pay

raise after what she considered was a "bad" evaluation.  (Evans Dep. at 103).  Her position,

schedule or duties were not changed after she reported Roberts.  She was not unfairly

written up.

14.    Evans resigned from MIMC in December 2003, and accepted a job at Thomas

Hospital in Fairhope, Alabama.  (Evans Dep. at 290-291).  Although Evans claims she left

---

[2]Evans' reference in her brief to her required signing of a confidentiality agreement as an act of retaliation is
a red herring.  In September 2002, all employees were required to sign a new confidentiality agreement which
corresponded with the revised IHS Confidentiality Policy to comply with HIPAA.  (Ex. 29, Ex. 31, Evans Dep.).  Evans
admits all employees in her department had to sign the new policy and admits it was changed to comply with
HIPAA.  (Evans Dep. at 216-219).  Her own testimony thus rebuts any inference that this action was an adverse
employment action causally related to her complaints about Roberts.

MIMC because of "harassing and badgering from her supervisors," she could identify no such incidents in the five months prior to her resignation other than the mere fact that Roberts was "still there." (Evans Dep. at 290-92). Moreover, Evans admits that she moved to Milton, Florida in September 2003 and had been commuting to MIMC, a farther distance than Thomas Hospital, since that time. (Evans Dep.at 129-30).

15.    At the time of her deposition, Evans had moved to Ocean Springs, Mississippi and had resigned her position at Thomas for a job in Ocean Springs because the drive was too long. (Evans Dep. at 7).

## CONCLUSIONS OF LAW

1.    **<u>Summary Judgment Standard</u>**

Defendants are entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and . . . affidavits . . . show that there is no ***genuine*** issue as to any ***material*** fact and that [the defendants are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). Under Rule 56(c):

> A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. A fact is "material" if it might affect the outcome of the suit under governing substantive law.

*Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for [the plaintiffs], there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Summary judgment is appropriate if the plaintiff fails to produce sufficient evidence to raise a genuine issue of material fact on the existence of an essential element of their claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986*); Manor Healthcare Corp. V. Lomelo,* 929 F.2d 633, 636 (11th Cir. 1991).  In considering defendants' motions for summary judgment, the Court views the facts presented, together with all reasonable inferences arising from the facts, in the light most favorable to the plaintiffs. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004).  As the moving party, the defendants have the initial burden of showing the absence of a genuine issue of material fact. *Id.*  Once the defendants make that showing, the burden shifts to the plaintiff to "come forward with *specific* facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (1986). Confronted with a properly supported motion for summary judgment, the plaintiff must adduce admissible evidence which creates a material factual dispute. *Clarke v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).   Plaintiff must do more than "simply show there is some metaphysical doubt as to the material facts." *Anderson,* 477 U.S. at 251-52. She must produce evidence. *Id.*

      2.      **<u>Scott Roberts - Assault/Battery Claims</u>**

      A.      **Evans claims prior to June 7, 2002, are barred.**

The Court first concludes that Evans' claims for assault/battery relative to any allegation of conduct occurring prior to June 7, 2002, are barred by the applicable statute

11

of limitations.  In other words, all of Evans claims for assault/battery are barred except the

fourth and final incident alleged to have occurred on June 10, 2002.

The Code of Alabama provides that "all actions for an injury to the person or rights

of another not arising from contract and not specifically enumerated in this section must be

brought within two years."  Ala. Code § 6-2-38(1).  The applicable statute of limitations for

a claim of assault/battery is two years.  *Wright, supra,* 654 So.2d at 544.  Consequently,

only the fourth and final incident alleged to have occurred on June 10, 2002, must be

addressed on its merits.

Evans contention that the limitations period was somehow tolled by the EEOC

proceedings is unsupported by law and entirely without merit.  It is well-established that the

statute of limitations for a plaintiff's state law claims is not tolled while the plaintiff is

pursuing administrative remedies with the EEOC.  *Johnson v. Railway Express Agency,*

*Inc.*, 421 U.S. 454, 466 (1975) (limitations period for § 1981 claim not tolled during the

time the EEOC conducted an administrative hearing on the Title VII claim as the two claims

are separate and distinct); *Gonzalez v. Firestone Tire & Rubber Co.,* 610 F.2d 241 (5th

Cir. 1980) (filing of a charge with the EEOC does not toll statute of limitations applicable

to a § 1981 claim based on same discriminatory events);*Gardner v. St. Bonaventure Univ.*,

171 F. Supp.2d. 118, 131 (W.D.N.Y.2001) (refusing to toll the statute of limitations for

state law claims during pendency of EEOC proceeding); *Stordeur v. Computer Associates*

*Int'l, Inc.*, 995 F. Supp. 94, 99 (E.D.N.Y.1998) (same).

**B.**     **Roberts is entitled to summary judgment in his favor.**

In order to succeed on her assault claim against Roberts, Evans must establish: (1) that Roberts touched her; (2) that Roberts intended to touch her; and (3) that the touching was conducted in a harmful or offensive manner.  *Ex parte Atmore Community Hosp.*, 719 So.2d 1190, 1194 (Ala. 1998).   A successful assault becomes a battery, which consists of the touching of another in a hostile manner. *Wright v. Wright*, 654 So.2d 542, 544 (Ala. 1995), *citing*, *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986), and *Singer Sewing Machine Co. v. Methvin*, 184 Ala. 554, 561, 63 So. 997, 1000 (1913).   A key element of the tort of battery is that "the touching was conducted in a harmful or offensive manner." *Atmore Community Hosp.*, 719 So.2d at 1194.  The Alabama Supreme Court noted that, in order to establish that the defendant committed an battery, there must be substantial evidence that the alleged touching occurred with sexual overtones and was unwelcome.  (*Id*.).

There is no evidence in this case that the alleged touching of Evans by Roberts on June 10, 2002, was conducted with any offensive sexual overtones.  The only evidence proffered by Evans is that, while attempting to straighten her admittedly wrinkled lab coat, Roberts' hand brushed across Evans' breast area, which was covered with four layers of clothing, for "not even a few seconds."  Evans has presented no evidence that this touching, if it indeed occurred at all, was intentional.

The Alabama Supreme Court has also held that the "manner or spirit" in which the touching occurs is critical as to whether the tort of assault exists.  *Harper v. Winston*

13

*County*, 892 So.2d 346, 353 (Ala. 2004).  Unlike *Harper*, there is no evidence in this case that the alleged touching on June 10, 2002, was done in an angry, revengeful, rude, insolent, or violent manner.  There is simply no evidence to support a contention that Roberts' conduct constituted a battery.  At best, Evans has asserted facts establishing an innocuous, accidental touching that does not rise to the level of a battery.

The Court must also agree that Evans' failure to complain or otherwise protest Roberts' alleged conduct at the time it occurred suggests that she did not, for whatever reason, perceive the conduct as offensive at the time.  *See e.g.*, *Paraohao v. Banker's Club, Inc.*, 225 F.Supp. 2d 1353, 1359 (S.D. Fla. 2002)("The correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained--of behavior] was unwelcome."), *quoting*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986). In the present case, Evans did not complain about Roberts' conduct even though co-workers were right outside the room.  Moreover, she never advised Roberts in any manner that his conduct was unwelcome.  (Evans Dep. at 41).  There is no evidence in this record to support the contention that Evans subjectively believed at the time Roberts' conduct occurred that it was offensive or that she perceived it to be "sexually harassing."

Roberts is entitled to summary judgment in his favor on the assault/battery claim.

### 3.  Mobile Infirmary Medical Center - Hostile Work Environment Claim

Evans does not challenge MIMC's assertion that she has presented no evidence of *quid pro quo* harassment, namely harassment by Roberts which resulted in a tangible employment action such as discharge, demotion or undesirable reassignment.  *See e.g.*,

14

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)("Defined tangible

employment action as one that "constitutes a significant change in employment status, such

as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits."). *See also*, *Lindsey*

*v. Burlington Northern Santa Fe Railway Co.,* 266 F. Supp. 2d 1338, 1344 (N.D. Ala.

2003)("An adverse employment action, for purposes of Title VII liability, involves 'a

serious and material change in the terms, conditions, or privileges of employment'."),

*quoting*, *Davis v. Town of Lake Park, Fla.,*  245 F.3d 1232, 1239 (11th Cir. 2001).  Evans,

according to her arguments in opposition to defendants' motions for summary judgment,

essentially concedes that she is asserting a claim under Title VII for a hostile environment.

In *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002), the

Eleventh Circuit set forth the elements necessary to support a hostile environment claim:

> Title VII of the Civil Rights Act of 1964 prohibits employers from
> discriminating "against any individual with respect to his
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin." 42 U.S.C. § 2000e- 2(a)(1). A hostile work environment claim
> under Title VII is established upon proof that "the workplace is
> ***permeated with discriminatory intimidation, ridicule, and insult,***
> ***that is sufficiently severe or pervasive to alter the conditions of the***
> ***victim's employment and create an abusive working environment.***"
> *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370,
> 126 L.Ed.2d 295 (1993). This court has repeatedly instructed that a
> plaintiff wishing to establish a hostile work environment claim show:
> (1) that he belongs to a protected group; (2) that he has been subject to
> unwelcome harassment; (3) that the harassment must have been based
> on a protected characteristic of the employee, such as national origin;
> (4) that the ***harassment was sufficiently severe or pervasive to alter***
> ***the terms and conditions of employment and create a***

15

> *discriminatorily abusive working environment*; and (5) that the
> employer is responsible for such environment under either a theory of
> vicarious or of direct liability.

277 F.3d at 1275 (emphasis added).  *See also*, *Mendoza v. Borden, Inc.*, 195 F.3d 1238,

1245 (11th Cir.1999) (applying these factors in the context of a hostile environment sexual

harassment claim).  The EEOC Guidelines describe the kinds of workplace conduct that

may be actionable under Title VII as "sexual harassment" to include "[u]nwelcome sexual

advances, requests for sexual favors, and other verbal or physical conduct of a sexual

nature." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986), *quoting*, 29 CFR §

1604.11(a) (1985).  The Guidelines further provide, however, that such sexual misconduct

constitutes prohibited "sexual harassment" only "where 'such conduct has the purpose or

effect of unreasonably interfering with an individual's work performance or creating an

intimidating, hostile, or offensive working environment'." *Id.*, *quoting*, 29 CFR §

1604.11(a)(3).

Consequently, the fourth element, whether the conduct complained of was

"sufficiently severe or pervasive to alter the conditions of employment and create an

abusive working environment," is the element that tests the legitimacy of most harassment

claims and is therefore regarded as crucial. *See, Gupta v. Florida Bd. of Regents*, 212 F.3d

571, 583 (11th Cir. 2000), *citing,  Faragher v. City of Boca Raton*, 524 U.S. 775, 788

(1998).    Only when the workplace is "permeated with 'discriminatory intimidation,

ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the

[employee's] employment and create an abusive working environment," is the law violated.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), *quoting*, *Meritor*,  477 U.S. at 67.

The employee must, therefore,  make both a subjective and an objective showing in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment.   *Mendoza*, 195 F.3d at 1246. The employee must establish not only that she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *Gupta*, 212 F.3d at 583, *citing*, *Mendoza*, 195 F.3d at 1246. The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all of the circumstances. *Mendoza*, 195 F.3d at 1246, *citing*, *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 81 (1998).

In determining whether the harassment objectively altered an employee's terms and conditions of employment, the following four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.   Mendoza*, 195 F.3d at 1246, *citing*, *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997).  The conduct must be examined in context, not as isolated acts, and the severity and pervasiveness of the conduct it must be judged under the totality of the circumstances.

*Allen*, 121 F.3d at 647.  *See also*, *Harris*, 510 U.S. at 23; *Henson*, 682 F.2d at 904;

*Faragher*, 524 U.S. at 787-88.

Although the Court would agree that the nature of some of the conduct about which

Evans complains, namely that Roberts asked "how the girls were doing" (allegedly referring

to her breasts) on one occasion, grabbed her bottom/butt on two occasions and  touched her

breast on one occasion cannot honestly be characterized as "normal day-to-day interactions

between members of the opposite sex," the crudeness of the alleged behavior does not

itself establish that the conduct was either harassing within the meaning of the law or

sufficiently severe or pervasive so as to alter the plaintiff's  terms or conditions of

employment.  Whether or not Evans agrees, the law is clear that not all offensive conduct,

however inappropriate or vulgar, is unlawful conduct.  *See e.g., Jones v. Clinton*, 909 F.

Supp. 657, (E.D. Ark. 1998) (hand on leg moving towards pelvis, attempted kiss and

exposure of genitals, "while boorish and offensive" . . . is not so severe and pervasive . . . to

have altered condition of employment and created an abusive environment.).   To cross the

line to unlawful conduct, offensive conduct  must be sufficiently severe and pervasive to

alter the conditions of employment and create an abusive working environment.  *Meritor,*

477 U.S. at 67.  The sporadic incidents complained of by Evans, occurring over at least six

years of working together, do not cross the line under this analysis.  Compare the following

authorities which failed to find an unlawfully hostile environment under factual allegations

similar or far worse than those made by Evans:  *Hockman v. Westward Comm. LLC*, 122

Fed.Appx. 734, 2004 WL 2980351 (5th Cir. 2004) (grabbing breasts and "behind" not

18

severe conduct).  *Meriweather v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003)

(grabbing buttocks "with force" did not satisfy high threshold of actionable hostile

environment); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993) (placing

hand on leg above the knee, rubbing upper thigh, kissing and lurching at her did not create an

objectively hostile environment).  *See also Mendoza v. Bordon,* 195 F.3d 1238, 1246-47

(11th Cir. 1999) (detailing additional cases).

As applied to the case at bar and as stated above, Evans' failure to complain or

otherwise protest Roberts' alleged conduct at the time it occurred suggests that she did not,

for whatever reason, perceive the conduct as offensive at the time.  *See e.g.*, *Paraohao v.

Banker's Club, Inc.*, 225 F.Supp. 2d 1353, 1359 (S.D. Fla. 2002)("The correct inquiry is

whether the [plaintiff] by her conduct indicated that the [complained--of behavior] was

unwelcome."), *quoting*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986). In the

present case, Evans did not complain about Roberts' conduct for several days after the last

alleged "offensive" conduct occurred.  Moreover, she never advised Roberts in any manner

that his conduct was unwelcome.  (Evans Dep. at 41).  There is no evidence in this record to

support the contention that Evans subjectively believed at the time Roberts' conduct

occurred that it was offensive or that she perceived it to be "sexually harassing."  Evans own

description of the incidents demonstrates that she was physically threatened or humiliated

by Roberts' alleged conduct.  (Evans Dep. at 24, 26, 29, 32, 37-40).

The courts which have analyzed similar complaints have consistently found such

conduct to be below the threshold required to demonstrate an unlawful hostile environment.

In *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), the plaintiff complained of several incidents of alleged sexual harassment including an occasion when "he just rolled his chair and came close to me and put his hand on my right thigh" and another when he rolled his chair toward the plaintiff and said "what kind of material is that?" as he lifted the hem of her dress about four inches. She claimed the supervisor called her at home repeatedly asking questions about her personal life. There were also other reported comments made during the same time period that the plaintiff felt were inappropriate and contributed to the hostile environment. All of the statements and actions about which she complained occurred during a period of six or seven months. *Id.* at 579. After examining the totality of the circumstances reported by the plaintiff in *Gupta*, the Eleventh Circuit found that no hostile work environment was created by the supervisor. The court noted that during the entire period the plaintiff and supervisor were interacting, each incident was only momentary and neither alleged incident of touching was coupled with any verbal suggestions or advances. The Eleventh Circuit in *Gupta* held:

> . . . we conclude the conduct and statements in question would not have interfered with a reasonable employee's performance of her job. . . . the alleged harassment in this case exemplifies "the ordinary tribulations of the workplace," which the Supreme Court and this Court have held do not constitute actual sexual harassment. [The plaintiff] failed to present evidence that [the defendant's] conduct was in any way physically threatening or humiliating," or that a reasonable person would view the conduct as "severe."

(Citations omitted). *Id.* at 586.

As applied to the case at bar, the conduct about which Evans complains was not severe. Evans alleges only three quick incidents of touching and a single inappropriate

20

comment.[3]  Evans describes the "touching" as quick and just long enough for her to push Roberts away.  (K. Evans Dep., pp. 30, 32, 37).  The conduct was never coupled with any sexual statements or innuendoes.  As recognized in *Gupta*:

> [The supervisor] should not have done these things.  But those were only two incidents in a period of six or seven months during which they were interacting out of an even longer period during which the two worked at the University.  Each incident was only momentary, and neither was coupled with any verbal suggestions or advances.

*Gupta,* 212 F.3d at 585.  Roberts never propositioned Evans nor did he ever make any suggestion that she had to perform any sexual act in order to keep her job or receive good evaluations.  The only alleged sexual statement is his query "How are the girls?" which Evans contends refers to her breasts.  Any reasonable person, male or female, would not find the conduct that purportedly occurred to be severe or pervasive.  See *Hockman v. Westward Comm., LLC*, 2004 WL 2980351 (5th Cir. 2004) (grabbing or brushing breasts and "behind" not severe conduct).  See *Meriweather v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003) (allegations including grabbing buttocks "with force" didn't satisfy high threshold of actionable hostile environment).

There is certainly no evidence in this record that it affected in any way the performance of her job. See also *Davis v. Baroco Electrical Construction Co.*, No. CIV. A. 99-1055-S, 2000 WL 33156436 (S.D., Ala. Dec. 15, 2000), (two or three sexual remarks

---

[3] Plaintiff testified numerous times in her deposition that there were only four incidents, one inappropriate comment, and three touchings.  (Evans Dep. at 18, 20, 40-41).  She then modified her testimony to say the "girls" comment was stated "on several occasions."  (Evans Dep. at 50-51).  By the end of the deposition, she claimed the girls comment was "constant" and daily, but she has no recollection of specific times or incidents.  (Evans Dep. at 146).  Judge Carnes aptly noted in his *Mendoza* concurrence that such changes in description from "several" to "constant," "illustrate the dangers of permitting litigation by perception" and cautioned "the court does well to rule out litigation by perception and require objectively offensive conduct that is itself severe or persuasive."  *Mendoza v. Bordon, Inc.*, 195 F.3d 1238, 1257 (11th Cir. 1999).

a day and four incidents of physical conduct not shown to interfere with plaintiff's job, fell short of actionable hostile environment sexual harassment).  In Evans' evaluation during the time of the alleged conduct, she received an "accomplished" rating and, therefore, received a pay raise for that time period.  (Evans Dep. at 270, Ex. 25).  Just as the Southern District of Alabama held in *Davis*, without a showing that the conduct affected the plaintiff's job performance, the plaintiff's claim falls short of actionable hostile environment sexual harassment.  *Davis*, 2000 WL 33156436, at *6-7.

Even if it could be said that Evans demonstrated an unlawful hostile environment, she cannot prevail because there exists no genuine issue that MIMC "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that Evans "unreasonably failed to take advantage of any preventative or corrective opportunities . . . or to avoid harm otherwise."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  It is undisputed that the anti-harassment policy was reviewed in orientation, is available in each department and is posted on various bulletin boards.  In enacting, enforcing and disseminating the anti-harassment policy, MIMC "exercised reasonable care to prevent harassment."  *See Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997).

Whether or not Evans agrees with MIMC's response to her complaint, or to its response to the complaints of her co-workers, it is undisputed that MIMC reacted immediately to each complaint, investigated it and took action to correct the behavior: Initially with Karri Evans, Barry Jones conducted an investigation, called several meetings, formally counseled  Roberts and documented the action in Roberts' file.  With Melissa Hanes, Randy Stembridge launched an investigation, interviewed a number of witnesses and in conjunction with Jones decided to remove Roberts from his supervisory role and to a

shift where he could be more closely supervised.  MIMC thus "exercised reasonable care to correct promptly any alleged sexually harassing behavior."

The record is clear that Evans unreasonably failed to take advantage of preventative opportunities to avoid harm.  She failed to report the first objectionable conduct for two months.  Her only excuse was that she was afraid to report it but she offers no basis for her fears.  The Court agrees that this is insufficient to excuse failure to follow a policy. *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1288 (11th Cir. 2001).

Evans argues that MIMC's response constituted nothing more than a "fraudulent demotion" of Roberts.  Evans' reasoning is mere sophistry.  It is undisputed that Roberts was removed from his team leader position and ceased to supervise Evans (or her co-workers, Hanes and Simmons).  It is undisputed he lost shift differential and was moved to day shift where he could be more closely supervised.  All of these actions were taken to prevent any further claims of inappropriate conduct.  Evans conceded that these corrective measures were successful.

That Roberts received a transfer involving a raise when two years later there had been no further claim of offensive conduct is a non-issue.  (Roberts Dep., p. 23).  The evidence of record establishes that: (1) Roberts still was not supervising anyone, particularly the complainants against him, (Roberts Dep., p. 25); and (2) the law does not require that an accused unconfessed harasser never be given the right to earn his way back into his employer's good graces with a clean record and strong job performance. While it is clear that Evans does not believe Roberts was sufficiently punished, she cannot dispute that MIMC's actions corrected the purported problem.  As recognized by the Eleventh Circuit in *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997).

> Although Farley remains unsatisfied with ACIPO's resolution of her
> complaint, we have never stated . . . that a complainant in a discrimination
> action has a right to the remedy of her choice.

*Id.* at 1555.

### 4.   **Mobile Infirmary Medical Center - Retaliation Claim**

### A.   **Pending discharge.**

To establish a prima facie case of retaliation under Title VII, Evans must prove the following:  (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; (3) there is causal connection between the participation and the protected activity and the adverse employment decision.  *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000) (citing *Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir. 1999)).  Evans failed to prove both that she suffered an adverse employment action and that there is a causal connection between the participation and the protected activity in any alleged adverse employment decision.

The acts that the Plaintiff claims comprised "retaliation" for reporting Roberts are not sufficient to rise to the level of tangible or adverse employment actions.  Her list of alleged retaliatory conduct includes: (i) having to take and give report to Roberts (K. Evans Dep., pp. 208-9, 268-69); (ii) receiving what she considered to be a bad evaluation (K. Evans Dep., pp. 98-102; (iii) being closely scrutinized and treated poorly by Chris Lawrence and Barry Jones (K. Evans Dep., pp. 208, 212-14, 232, 238, 243); (iv) being forced to sign a confidentiality agreement.  (K. Evans Dep., pp. 207, 225-27); and (v) that she was "constructively discharged."    With respect to her claim of retaliation, Evans specifically testified as follows:

> There were a couple of incidents with Chris while I was trying
> to send a TAO to him and he came in and was, you know

24

> standing over my shoulder and trying to read the TAO. . . .
> trying to force me to give Scott one on one report and interact
> with him and try to force me to do the protocols . . . probably
> the first harassing incident was the first time that Chris has
> assigned me to give report to Scott . . . banning me from talking
> to anybody about it.  The meeting with Barry [Jones] on the
> 10th [relating to taking report] . . .
>
> . . .
>
> An incident with Chris . . . on December 12 and him assigning Scott to
> my area again.  Roberts taking shift report with [her] on January 31st .
> . . Barry . . . accusing [her] of hooking the ventilator up wrong [during
> a] code on [February 18] . . .

(Evans Dep. at 208-214 and 228-233).  Evans further describes an incident on April 1,

2003, when Chris Lawrence yelled at her about whether she was clocked out when she was

waiting in the office for a meeting with Jones and he told her to do something productive

while she was waiting like changing out oxygen tanks.  (Evans Dep. at 246).  The last

incident she describes occurred on May 27, 2003 when her supervisor, Nancy Egan,

refused to let her have time off on an evening shift and then went home early herself

because she was sick.  (Evans Dep. at 253-255).

Evans' primary complaints about her supervisors were their "attitudes" and their

criticism of her work.  This conduct does not rise to the level of an "ultimate employment

decision" or "adverse employment action" within the meaning of the law.  Evans' only

formal reprimands during this time period were for excessive absence which she admits.

(Evans Dep. at 275).  She complains about her 2003 evaluation but admits she got a raise.

Moreover, a review of the evaluation  reflects that her final score was increased, not

decreased, as she suggests.  (B. Jones Dep. at 100-101).  Despite Evans' litany of

25

complaints against her supervisors, Barry Jones and Chris Lawrence, it is clear that nothing they said or did cost her pay, cost her time from work or cost her any job opportunities.[4] Similar acts of "hostility," demeaning comments and conduct actions have been found insufficient to an employment action to support a retaliation claim.  *See Hockman v. Westward Comm., LLC*, 2004 WL 298035 (5th Cir. 2004); *McDaniel v. Merlin Corp.*, 2003 WL 21685622 (N.D. Ga. 2003).

Nothing in Evans' description of the alleged transgressions against her after she reported Roberts' conduct amounts to an "adverse employment action" sufficient to establish a retaliation claim.  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).  The courts have defined "adverse employment action" as requiring an "ultimate employment decision" *id.* or a serious and material change in the terms, conditions or privileges of employment.  *Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001).

An adverse employment action must constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998).  In *Merriweather v. Alabama Dept. of Public Safety,*  17 F. Supp. 2d 1260, 1274 (M.D. Ala. 1998), *aff'd* 199 F.3d 443 (11th Cir. 1999), the plaintiff alleged that in retaliation she was given negative job evaluations, written

---

[4]*See*, n. 2, *supra*.

counseling statements and limitations on assignments.  The court dismissed the claim on

summary judgment, concluding:

> Merriweather has alleged no loss of pay, benefits, job classification, or
> change of duties as a result of this alleged retaliation.  Considering this
> evidence in the light most favorable to the plaintiff, this court finds that the
> evidence is insufficient to support...an adverse employment action.

17 F.Supp. at 1274-76.  The court held that an employment action involving no appreciable

change in working conditions simply cannot constitute an adverse employment action.  17

F. Supp. 2d at 1276.  "Otherwise, every trivial personnel action that an irritable, chip-on-the-

shoulder employee did not like would form the basis of a discrimination suit."  *Whitehead*

*v. Norfolk S. Ry.,*  53 F.Supp. 2d 1380, 1383 (M.D. Ga. 1999) (quoting *Williams v. Bristol-*

*Myers Squibb Co.,* 85 F.3d 270-74 (7th Cir. 1996)).

## B.    Constructive Discharge Claim

The final element of retaliation claimed by Evans is that she was constructively

discharged.  However, she has failed to present sufficient evidence to support such a claim.

"A constructive discharge occurs when a discriminatory employer imposes working

conditions that are 'so intolerable that a reasonable person [in the employee's] position

would have been compelled to resign'"  *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d

974, 978 (11th Cir.2003) (quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d

551, 553 (11th Cir. 1997)).  In *Pennsylvania State Police v. Suders*, 524 U.S. 129, 124

S.Ct. at 2342 (2004), the United States Supreme Court set forth the elements of a

constructive discharge under Title VII:

> To establish constructive discharge, the plaintiff must make a further
> showing:  She must show that the abusive working environment became so
> intolerable that her resignation qualified as a fitting response.

*Suders*, 124 S.Ct. at 2347.  "Mere harassment, alone, is insufficient ; rather, the plaintiff

must show 'aggravating factors' to justify departure."  *Hockman v. Westward Comm., LLC*,

122 Fed. Appx. 734 (5th Cir. 2004).

Evans failed to demonstrate any tangible action that was taken that would force a

reasonable person to resign their position.  The Fifth Circuit in *Hockman* listed factors that

would be sufficient to find constructive discharge:

> Such factors include: (1) demotion; (2) reduction in salary; (3) reduction in
> job responsibilities; (4) reassignment to menial or degrading work; (5)
> reassignment to work under a younger supervisor; (6) badgering, harassment,
> or humiliation by the employer calculated to encourage the employee's
> resignation; or (7) offers of early retirement or continued employment on
> terms less favorable than the employee's former status.

*Id.*  None of these things were claimed by Evans.  In *Durley v. APAC, Inc.*, 236 F.3d 651,

658 (11th Cir. 2000), the Eleventh Circuit held that claims by the plaintiff that she was

harassed regarding her absences and tardiness, treated poorly by fellow employees, and that

she received a smaller raise than her contemporaries was not sufficient to support a claim

of constructive discharge.  In *Pipkins v. City of Temple Terrace, Florida*, 267 F.3d 1197,

1201 (11th Cir. 2001)(summary judgment affirmed), the Eleventh Circuit held that

"repeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise

to the level of such intolerable conditions that no reasonable person would remain on a

job."

Evans refers to several occasions of criticism and scrutiny from her supervisors from August 2002 to April 2003.  She had no specific incidents after May 27, 2003, when she was given a performance review she disagreed with.  (Evans Dep. at 292).  Evans' complaints are certainly no more serious than those found insufficient to support a constructive discharge claim in *Durley* and *Pipeline*.  Evans admits that after May 27, she was never yelled at or called in for any work performance issues.  (Evans Dep. at 303).  Moreover, Evans cannot point to any specific incidents in the last five months of her employment that were "so intolerable" that she was compelled to resign in December 2003.

5. **Mobile Infirmary Medical Center - State Law Claims**

A. **Negligent Supervision, Training and Retention Claim**

Evans asserts a cause of action against MIMC for negligent supervision of Roberts, which is based upon her allegation that MIMC's "failure to adequately supervise Roberts caused and allowed the sexual harassment by Roberts of Plaintiff to occur."  (Pl.'s Compl. ¶ 44).  Evans also asserts claims against MIMC for "Negligent Hiring, Training and Retention of Roberts."  In Count V of the Complaint, the Plaintiff asserts that MIMC negligently supervised Roberts since no action was taken to:

A.   Sufficiently discipline Roberts for his conduct towards the Plaintiff; and/or

B.   Sufficiently separate Roberts from Plaintiff; and/or

C.   Create, disseminate, and enforce an adequate policy prohibiting gender discrimination, sexual harassment and/or retaliation, and provide no formal or informal training to supervisory employees; and/or

D.      Cause Roberts to understand that gender discrimination and/or
        retaliation was against the law and to obey that law; and/or

E.      Cause Roberts to understand that gender discrimination and/or
        retaliation would not be tolerated at Mobile Infirmary Medical Center;
        and/or

F.      Train its employees in proper follow-up and investigation techniques
        to be utilized in gathering evidence of discrimination and harassment
        in the workplace; and/or

G.      Train supervisors in proper reporting procedures to be implemented
        upon encountering evidence of employment discrimination and
        harassment in the workplace; and/or

H.      Train supervisors in what remedial action was available and
        appropriate upon encountering evidence of employment
        discrimination and harassment in the workplace.

(Pl.'s Compl. at ¶ 59(A-H)).  In that same count, Evans alleges that MIMC failed to train

and supervise its employees that discrimination and retaliation would not be tolerated.

According to Evans, this resulted in her suffering sexual harassment from Roberts.

        In order to establish a prima facie case for negligent hiring, training, supervision or

retention, Evans must:

        [Affirmatively show] that had the master exercised due and proper diligence,
        the master would have learned of the incompetency.  This may be done by
        showing specific acts of incompetency and showing that they were brought to
        the knowledge of the master, or by showing them to be of such a nature,
        character, and frequency that the master, in the exercise of due care, must
        have had notice of them.

*Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995).  In the present

case, Evans has failed to show that MIMC was aware of any alleged incompetence of

Roberts that would support a claim for negligent supervision.

        In *Mardis,* the plaintiff alleged that her employer was liable for negligent

supervision and training in that it failed to train its supervisory personnel in handling sexual

harassment complaints and providing a means for employees to present their complaints. The claims were based on the allegations that the plaintiff experienced sexual harassment at the hands of a co-employee. The plaintiff quit her job the day after the alleged sexual harassment was reported to her employer. The court held that the plaintiff had not shown that the employer had knowledge of the alleged incompetency of her co-employee until she reported the sexual harassment. *Id.* at 890. She could not have suffered any damages after the employer became aware of the incompetency due to the fact she quit her employment the next day. The employer was not liable for any actions which caused her damage prior to their knowledge of the incompetence. *Id.*

As applied to the case at bar, Evans cannot hold MIMC liable for any damages that resulted from actions of Roberts prior to the time they became aware of the alleged incompetence of Roberts. Evans, herself, had worked with Roberts since 1996. By her own admission, she did not experience, any problems with sexually harassing conduct until April 2002. (Evans Dep. at 17-18). There is no evidence that anyone had reported inappropriate conduct by Roberts prior to Evans' complaint on June 15, according to her testimony. The last incident of alleged sexually harassing conduct by Roberts purportedly occurred on June 10, 2002. (Evans Dep. at 80). There were no further incidents after action was taken by MIMC in response to the allegations of the Plaintiff. (Evans Dep. at 182). The last time Evans endured any offensive conduct by Roberts was prior to the time she reported any harassment to MIMC.

31

MIMC is not liable for any actions that occurred prior to the time they gained knowledge of the alleged incompetency of Roberts. All alleged incidents, according to Evans own testimony, occurred prior to that time. Therefore, MIMC is not liable to Evans for negligent supervision, training, retention or hiring.

Moreover, MIMC cannot be held liable for negligent training and/or supervision unless the Plaintiff proves the underlying torts of sexual harassment. In *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 2000), a jury found that the defendant employee was not liable for any tort, but that the employer was liable for negligent supervision and training. The Supreme Court of Alabama reversed the jury's verdict holding that it was an inconsistent verdict stating:

> But, [the employer] cannot be held liable for authorizing or ratifying conduct that, according to the jury, did not occur. Accordingly, a verdict against [the employer] based on a finding of negligent training and supervision would be inconsistent with a verdict exonerating [the employee].

*Id.* at 825. Furthermore, the Alabama Supreme Court has held that a plaintiff is required to prove an underlying common-law tort in order to prevail in a claim for negligent supervision, training or retention. *Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003); *Voyager Ins. Co. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999). The claim of sexual harassment is not sufficient in order to support the claim. In *Thrasher v. Ivan Leonard Chevrolet*, 195 F. Supp. 2d 1314, 1319 (N.D. Ala. 2002), the Northern District of Alabama held:

> In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law Alabama tort.  As Alabama does not recognize a common-law tort for sex discrimination in employment, the Court finds that Plaintiff cannot maintain an action for negligent supervision, training, and/or retention based upon conduct that is employment discrimination, but does not support a common law tort.

*Id.*  In the present case, the Plaintiff's claims of sexual harassment, even if proven to be true, are not sufficient to support a claim for negligent supervision, training and/or retention.  As the assault claim is also due to be dismissed, as discussed above, it cannot provide the basis to support a claim for negligent supervision, training or retention.  In order to hold Mobile Infirmary liable for the actions of Roberts, Evans is required to first prove by a preponderance of the evidence that Roberts did, in fact, commit the alleged torts she asserts in her complaint.  This she has failed to do.  Accordingly, MIMC is entitled to summary judgment in its favor as a matter of law as to Evans' claim of negligent supervision, hiring and retention of Roberts.

### B.  Assault/Battery Claim

Evans makes allegations of three incidents of alleged assault by Roberts.  The first two occurred in May 2002.  For the reasons stated above, the only alleged incident that is not barred by the applicable two year statute of limitations is the incident which occurred on June 10, 2002.  In order to hold MIMC liable for the alleged June 10, 2002 assault/battery by Roberts, Evans must first present sufficient evidence that the assault/battery actually occurred.  Again, for the reasons stated above, she has failed to do so.

Moreover, assault is classified as an intentional tort. *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 2000). "For an employer to become liable for the intentional torts of its agent, the plaintiff must offer evidence that (1) the agent's wrongful acts were in the line and scope of his employment; or (2) that the acts were in furtherance of the business of the employer; or (3) that the employer participated in, authorized or ratified the wrongful acts." *Machen v. Childesburge Bancorp, Inc.*, 761 So. 2d 981, 984 (Ala. 2000) (citing *Potts v. BE & K Construction Co.*, 604 So. 2d 398, 400 (Ala. 1992)). Assuming *arguendo* that the conduct Roberts is accused of by Evans did actually occur, such conduct was clearly not in the line and scope of his employment or in furtherance of the business of MIMC. *See e.g., Machen v. Childesburge Bancorp, Inc.*, 761 So. 2d 981, 984 (Ala. 2000)("[E]mployee's acts of sexual harassment were not committed in the line and scope of employment or in furtherance of the employer's business, but were merely to satisfy the defendant's own desires"); *Doe v. Swift*, 570 So. 2d 1209, 1210 (Ala. 1990)("[T]he test is whether 'it can be shown that the servant acted from wholly personal motives having no relation to the business of the master'."); *Joyner v. AAA Cooper Transportation*, 477 So. 2d 364, 365 (Ala. 1985) (where sexually harassing conduct was committed without knowledge of the employer and ceased as soon as the employer warned the offending employee, there was not a "scintilla of evidence to indicate that [the employee's] acts were within the line and scope of his employment of that they were in furtherance of [employer's] business.").

In addition, it is clear that once MIMC first learned of the allegations concerning Roberts, they conducted an investigation and took adequate steps to remedy the situation.  It is undisputed that there has not been a single allegation against Roberts since MIMC initially learned of the allegations on June 13, 2002.  Evans has not presented any evidence that MIMC failed to take adequate steps to remedy the situation once she reported it  While she does not agree with the steps they took, she cannot legitimately deny they were successful. Therefore, Evans has failed to present evidence that MIMC ever ratified the conduct of Roberts such that it can be held liable for his alleged intentional torts, had such torts even been proven in this case.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that defendants' motions for summary judgment are due to be and are hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendants, Mobile Infirmary Medical Center and William S. Roberts, and against the plaintiff, Kerri A. Evans, the plaintiff to have and recover nothing of the defendants.  Costs are taxed against the plaintiff.

**DONE** this 2nd day of August, 2005.

_____s/ W. B. Hand_____
SENIOR DISTRICT JUDGE